UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **JAMAL SHARIF GARDNER**, | Case No. 6:12-cv-02096-KI |
| Petitioner, | OPINION AND ORDER |
| v. | |
| **ROB PERSSON**, | |
| Respondent. | |

Corinne J. Lai
P.O. Box 2218
Lake Oswego, OR 97035

    Attorney for Petitioner

Mary H. Williams
Deputy Attorney General

Page 1 - OPINION AND ORDER

Samuel A. Kubernick
Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, OR 97301-4096

       Attorneys for Respondent

KING, Judge:

Petitioner Jamal Sharif Gardner, an inmate incarcerated at Oregon State Correctional

Institution, brings this action, pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus.  For

the reasons set forth below, I deny the petition.

**FACTS**

On November 30, 2005, a jury convicted petitioner of two counts of Felony Assault in the

Fourth Degree, two counts of Misdemeanor Assault in the Fourth Degree, one count of Assault in

the Second Degree, one count of Unlawful Sexual Penetration in the First Degree, and

Strangulation.  He received a total sentence of 130 months' imprisonment.

Petitioner was charged with these crimes after his ex-girlfriend, Elizabeth Sutton,

reported that he had abused her on five occasions:  April 2003, July 2003, November 2003,

December 2003, and January 2004.  The jury found him not guilty of one count of Misdemeanor

Assault in the Fourth Degree arising out of the alleged November 2003 interaction, but found he

had committed the charged crimes on the other dates.

The only interactions that are relevant for purposes of this petition occurred in April and

July 2003 when petitioner and Sutton were living together in the Sunflower Apartments.  With

respect to the April 2003 event, petitioner was charged with one count of Misdemeanor Assault

in the Fourth Degree.  Sutton testified that petitioner "gave me a black eye for a present on my

birthday" after the two of them had spent the entire day arguing.  Ex. 107, Tr. 171.

Petitioner was also charged with one count of Felony Assault in the Fourth Degree,

Felony Assault in the Second Degree, and Unlawful Sexual Penetration in the First Degree

arising from Sutton's allegations from a July 2003 series of incidents.  Sutton testified that in

July 2003, she and petitioner began arguing in the early morning, with him calling her a "whore,"

a "slut," and a "bitch." Ex. 107, Tr. 176.  She went to work that day, and he warned her not to

come back to the apartment.  While she was at work, he left messages on her cell phone telling

her not to return to the apartment or she would regret it, but then he would change his mind and

leave messages telling her he needed to talk to her and if she did not return he would destroy her

stuff.  He then left messages telling her he was kicking in her VCR, throwing her makeup all

over the bathroom, and throwing her collectibles around the room.  Because Sutton worked a

split shift, she returned to the apartment and saw that it had been trashed; a butcher knife had

been stabbed into her stuffed M&M figure, makeup had been thrown around the bathroom, and

"I hate you.  Die bitch die" had been written in lipstick on the mirror.  She left the apartment,

picked her son up at the babysitter's and dropped him off at her parents' house, and then returned

to work for the second half of her shift.

When she finished her shift, she picked her son up and they both returned to the

apartment.  Petitioner was passed out on the living room floor.  Sutton put her son in her bed, she

changed her clothes, and got into bed herself.  Petitioner awakened her by opening the bedroom

door, turning on the light, and saying, "Get out here, bitch." Ex. 107, Tr. 183.  She left the room

because her son was asleep in there.  Petitioner and she returned to the living room where

petitioner yelled at her, accused her of stealing his money, and of not loving him.  When Sutton did not give what petitioner thought was the right answer, he kicked her with his shoes on and hit her with his fist.  At some point, petitioner grabbed Sutton by the throat and threw her into the bathroom, where her head broke the towel rack.  He ordered Sutton to take her clothes off, poured beer on her, told her he was going to treat her like a slut, and directed her to perform oral sex on him.  He then picked her up by her hair, turned her over, and performed vaginal intercourse.  Sutton was crying, asked him to stop, and told him that it hurt.  He then stopped and "put about two or three fingers into my–into my bottom;" she told him to stop and that it hurt. Ex. 107, Tr. 188.  He tried to insert his penis in her anus, and she told him she had to go to the bathroom to get him to stop.

When Sutton returned to the living room, petitioner asked for a bag of ice because his hand hurt.  In the morning, Sutton saw a huge hole in the wall and figured he hurt his hand by punching the wall.  He settled down for a while, but then began questioning Sutton again, threw the ice bag at her, hit her several more times with his shoes, his fists, and cracked a wooden spoon on her head.  He then asked for a back massage because he was tired.  Sutton complied. He fell asleep for about an hour.

Sutton and the baby got up to get ready for the day.  While she was changing his diaper, petitioner hit her in the lower back with something and she fell forward into the baby's stomach. He hit her most of the morning, yelling at her for hours.  Sutton then put the baby down for a nap in the afternoon.  Petitioner began berating her again.  He picked up a wooden baby gate and began to swing it at Sutton's head.  She raised her hand and the gate came down and broke her little finger.  Petitioner eventually left the apartment, taking Sutton's car keys with him.

Page 4 - OPINION AND ORDER

Sutton called petitioner's mother; petitioner's mother, brother, and the brother's fiancé picked Sutton and the baby up and took them to the hospital. The ER physician documented bruising around Sutton's eye, blood in her eye, a tender scalp, bruising on her head, face, chest, abdomen, back, right shoulder, arm, right thigh, right hand, and left knee and leg. X-rays revealed her little finger on her right hand was broken in two places. Sutton reported to the ER physician that her boyfriend had kicked, punched and struck her with a baby gate.

Petitioner's mother testified that she did not see any signs of abuse on Sutton in April 2003. She testified that the apartment at the Sunflower Apartments was located on the second floor. The apartment in which Sutton and petitioner lived in was on the left and there was another apartment on the right, separated by approximately three feet. Petitioner's mother testified that Sutton called her in July 2003 crying and saying petitioner was sleeping with the woman downstairs. When petitioner's mother arrived, Sutton told her that petitioner had told her about what he had done, she had tried to talk to him about it, she went to grab him, tripped over the baby gate and hurt her fingers. Sutton then got in the car with petitioner's mother, brother, and the brother's fiancé and picked up the baby at the babysitter's. When they were almost to the mother's house, Sutton asked her to take Sutton to the hospital because her fingers were hurting. She also said, "Maybe I should have them check my butt too," which shocked petitioner's mother. Ex. 108, Tr. 281. When petitioner's mother questioned her, Sutton confirmed petitioner had not coerced her, that she and petitioner have anal sex, and then said, "I enjoy it. We do it routinely. I thought everybody did." Id. Petitioner's mother testified that she did not see any bruising on Sutton's face, hemorrhaging to the inside of her eye, or any outward signs of physical injury, other than the swollen fingers.

Page 5 - OPINION AND ORDER

Petitioner's brother's fiancé testified similarly.  She testified she did not notice any black eye or marks on Sutton's arms, and just noticed Sutton's fingers which she understood Sutton had hurt by tripping over a futon or baby gate.  She also testified Sutton told her the night before petitioner and she had engaged in "anal sex and that he got a little rough but she enjoyed it" and she might want to have a doctor check her out.  Ex. 109, Tr. 319.

Petitioner also testified.  As relevant to his petition, he admitted to verbally abusing Sutton.  On cross-examination, with respect to the alleged April incident, petitioner testified it never happened "and it wouldn't have happened in the Sunflower Apartments" because at that time Sutton lived with her parents; Sutton did not move in the apartment until "way after May 1st."  Ex. 109, Tr. 401.

Petitioner admitted that in July 2003, he called Sutton a bitch and told her to come into the living room.  He said he was asking her who she was out with, because he thought he had caught her at a Starbucks with someone else.  He admitted that when she turned on the bathroom light, she saw that he had written "whore," "bitch," and "liar" in lipstick on the mirror.  He admitted that he had put a butcher knife through the M&M pillow.  He admitted to punching a door, and then said he left to spend the night with a neighbor downstairs.

When he snuck back in the apartment the next morning, Sutton "walked out and immediately started yelling at me about punching the hole in the wall."  Ex. 109, Tr. 375.  When he told her he slept with the neighbor, "tears started rolling down her eyes, and [she] got completely hysterical."  Ex. 109, Tr. 376.  When he said he was leaving to get cigarettes "she started yelling at me for smoking[.]"  Id.  Petitioner started down the stairs, he heard his name, and then heard a big thud.  When he walked back upstairs, Sutton was on the floor on top of the

baby gate and on top of his PlayStation.  Sutton "started yelling at me, asking me how I could

cheat on her."  Id.  When he tried to help her, "[s]he screamed, 'Get away from me.'  And all the

windows were open [in] our house and it was the middle of the day and there was a bunch of

people downstairs and we lived right next to the pool."  Ex. 109, Tr. 377.

He also testified that when he and Sutton got in a subsequent argument a few weeks later,

he threw her belongings down the steps.  The apartment complex manager called petitioner and

told him he would be fined if he did not pick up the items from the stairs.

### LEGAL STANDARDS

An application for a writ of habeas corpus shall not be granted unless adjudication of the

claim in state court resulted in a decision that was (1) "contrary to, or involved an unreasonable

application of, clearly-established federal law, as determined by the Supreme Court of the United

States" or (2) was "based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d).  The state court's findings of fact

are presumed correct, and a petitioner bears the burden of rebutting the presumption of

correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d) is a "'guard against extreme malfunctions in the state criminal justice

systems, not a substitute for ordinary error correction through appeal.'"  Hibbler v. Benedetti,

693 F.3d 1140, 1148 (9th Cir. 2012) (quoting Harrington v. Richter, __ U.S. __, 131 S. Ct. 770,

786 (2011)) (other internal quotation omitted), cert. denied, 133 S. Ct. 1262 (2013).  "'[T]he

question . . . is not whether a federal court believes the state court's determination was incorrect

but whether that determination was unreasonable–a substantially higher threshold.'"  Id. at 1146

(quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).

**DISCUSSION**

I.       Procedurally Defaulted Claims

Respondent points out all but one of petitioner's claims are procedurally defaulted.

Generally, a state prisoner must exhaust all available state court remedies either on direct appeal

or through collateral proceedings before a federal court may consider granting habeas corpus

relief.  28 U.S.C. § 2254(b)(1).  A state prisoner satisfies the exhaustion requirement by "fairly

presenting" his claim to the appropriate state courts at all appellate stages afforded under state

law, including a state supreme court with powers of discretionary review.  Baldwin v. Reese, 541

U.S. 27, 29 (2004); Casey v. Moore, 386 F.3d 896, 915-16 (9th Cir. 2004).

When a state prisoner fails to exhaust his federal claims in state court, and the state court

would now find the claims barred under applicable state rules, the federal claims are procedurally

defaulted.  O'Sullivan v. Boerckel, 526 U.S. 838, 848 (1999).  If a state prisoner procedurally

defaults on a claim in state court, a federal court will not review the claim unless the state

prisoner shows cause for the procedural default and actual prejudice from it, or that "failure to

consider the claims will result in a fundamental miscarriage of justice."  Wainwright v. Sykes,

433 U.S. 72, 87 (1977); Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Here, petitioner does not dispute that all but one of his claims are procedurally defaulted.

Indeed, while petitioner raised all of his claims in his initial post-conviction review (PCR)

proceeding, he appealed only subpart m to the Oregon Court of Appeals (which affirmed without

opinion) and to the Oregon Supreme Court (which denied review).  Furthermore, petitioner does

not argue or demonstrate cause and prejudice to excuse the procedural default, or that a

miscarriage of justice will occur if his claims are not considered.  Grounds one and two,

including all subparts, are procedurally defaulted with the exception of ground one, subpart m.

II.      Ground One, Subpart M

Petitioner's only remaining claim is that his trial counsel was ineffective for failing "to

call all available witnesses and present evidence," referencing neighbor Bradlee Bowman.  Pet.

Attach.

In support of petitioner's initial PCR proceeding, he submitted an affidavit from Bowman

that read as follows:

> I, Bradlee Bowman, live at the Sunflower Apartments in apt. 104, which is
> directly across from and connected to the apartment that Jamal Gardner, Elizabeth
> Sutton and their son occupied during April to August of 2003.  There is only one
> way either family could get to our apartment being that there is only one stairwell
> we both shared.  I saw Jamal and Elizabeth in passing often before directly
> meeting them.  I am quite sure that they moved into the apartment in April
> because it was before me and my son's birthdays which are in May.  The walls of
> these apartments are paper thin and sometimes could easily hear pieces of each
> others conversations.  I never heard any out of control arguments or any noises
> that would lead me to believe someone was being abused.  I also never saw any
> bruises or injuries to Elizabeth whom I spoke to from time to time and saw in
> passing quite often.

Ex. 118.

In his deposition, petitioner thought his trial attorney ought to have subpoenaed Bowman

to court to testify.  Petitioner had given Bowman's phone number and address to his attorney, and

"I even gave a place of business because we used to work together[.]"  Ex. 124, at 35.

Petitioner's trial attorney agreed that the theory of the case was that the incidents did not

occur as Sutton described them and that people had not seen the injuries on her.  He pointed out,

however, that Sutton testified that "she was covering up the injuries in an effort to protect Mr. Gardner." Ex. 123, at 27. He could not remember why he had not called Bowman, but offered:

> So–and perhaps we just wanted to call solid witnesses. I mean, unfortunately, I do make mistakes in trials. One of the mistakes that I've made in the past is –is asking too many questions on cross-examination, or calling too many witnesses to establish something, because the –if I can get a fact in through a solid witness I may not want to call another witness that may be more likely to be impeached and then weaken that testimony.

Id.

The judge presiding over petitioner's PCR proceeding reported he had read the parties' briefs, the petitioner's deposition and trial counsel's deposition. He recognized in the hearing that "one of the more important issues Mr. Gardner wanted to raise was that he didn't think counsel did an adequate job of subpoenaing all his–which he thought were the essential witnesses in the case." Ex. 125, at 5. The court then denied relief finding no grounds for post-conviction relief, and specifically finding no inadequate assistance of counsel. In his written findings, he wrote, "Insufficient evidence that additional witnesses would have helped." Ex. 126, at 2.

To prevail on a claim of ineffective assistance of counsel, petitioner must show both (1) that the attorney's performance fell below an objective standard of reasonableness; and (2) that the performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687, 688 (1984). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or what "might be considered sound trial strategy." Strickland, 466 U.S. at 689. Reasonableness is judged as of the time of counsel's conduct, not in hindsight. Id. at 689-90. The reasonableness of counsel's actions "may be determined or substantially influenced by [petitioner's] own statements or actions." Id. at 691.

A federal court reviews a state court's application of Strickland for reasonableness, not

for correctness.  Hibbler, 693 F.3d at 1150.  The federal court does not ask "'whether counsel's

actions were reasonable'" but "'whether there is any reasonable argument that counsel satisfied

Strickland's deferential standard.'"  Id. (quoting Harrington, 131 S. Ct. at 788).  "Accordingly, a

'doubly deferential judicial review' applies to Strickland claims rejected by the state court."  Id.

(quoting Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)).

The PCR court's conclusion that there was "[i]nsufficient evidence that [Bowman's]

testimony] would have helped" is supported by the PCR record and is neither contrary to nor an

unreasonable application of Strickland.  As petitioner's trial counsel noted, other witnesses,

including Sutton's own mother, had testified that they had not seen bruises on Sutton.  In

addition, Sutton made an effort to hide the bruises with makeup.

Additionally, Bowman's testimony would have been relevant only to the April or July

2003 events because, according to Bowman, petitioner and Sutton lived there only from April to

August 2003.  However, Bowman's testimony either would have been unhelpful or inconsistent

with petitioner's as to any April incident because, according to petitioner, any incident in April

would not have happened at the Sunflower Apartments as Sutton had not moved in with him

until May.  Bowman's testimony would have been irrelevant as to any of the other incidents

alleged to have occurred after August.

With respect to Bowman's testimony that he never heard "any out of control arguments or

any noises that would lead me to believe someone was being abused," his testimony would seem

to contradict petitioner's own testimony.  Petitioner admitted to loudly arguing with Sutton,

punching a door, Sutton screaming at him with all the windows open, and to throwing Sutton's

Page 11 - OPINION AND ORDER

belongings down the stairs.  In addition, the injuries petitioner inflicted on Sutton's body were well-documented by the ER physician.  In short, as the PCR court noted, there was "[i]nsufficient evidence that [Bowman's testimony] would have helped" petitioner.

Petitioner argues that Bowman would have been the only supporting witness who did not have a personal connection to petitioner and who could be viewed by the jury as unbiased.  As petitioner himself acknowledged, however, he used to work with Bowman and lived next door to him.  While Bowman would have been the only supporting witness who was not a relative, because of his connection to petitioner through both work and home a jury would not necessarily have viewed him as a completely neutral bystander.  In short, the PCR court's rulings that defense counsel was not deficient, and that petitioner was not prejudiced, were not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 131 S. Ct. at 786-87.

## CONCLUSION

Based on the foregoing, the Petition for Writ of Habeas Corpus [1] is denied.  This proceeding is dismissed with prejudice.  Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.  See 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this ___29th___ day of April, 2014.


/s/ Garr M. King
Garr M. King
United States District Judge